# United States Court of Appeals

## For the First Circuit

––––––––––––––

No. 04-1379

ARTHUR HARVEY,

Plaintiff, Appellant,

v.

ANN VENEMAN, SECRETARY OF AGRICULTURE,

Defendant, Appellee.

––––––––––––––––––––––

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. D. Brock Hornby, U.S. District Judge]

–––––––––––––––––––––––––

Before

Boudin, Chief Judge,

Selya, Circuit Judge,

and Schwarzer,[*] Senior District Judge.

–––––––––––––––––––––

　　　Paula Dinerstein with whom Lobel, Novins & Lamont was on brief for appellant.
　　　Susan E. Stokes, Jill E. Krueger, Farmers' Legal Action Group, and Joseph Mendelson III, Center for Food Safety, on brief for Rural Advancement Foundation International-USA, Center for Food Safety, and Beyond Pesticides, Amici Curiae.
　　　James Handley, Handley Environmental Law, on brief for Organic Consumers Association, Sierra Club, Public Citizen, Inc., Northeast Organic Farming Association/Massachusetts Chapter, Inc., John

–––––––––––––––––––

[*]Of the Northern District of California, sitting by designation.

Clark, Merrill Clark, Anne Mendenhall, Greenpeace USA, and Waterkeeper Alliance, Amici Curiae.

Halsey B. Frank, Assistant United States Attorney, with whom Paula D. Silsby, United States Attorney, was on the brief for appellee.

_____

January 26, 2005

_____

**SCHWARZER, <u>Senior District Judge</u>.** Arthur Harvey appeals the District Court's grant of summary judgment to Secretary of Agriculture Ann Veneman on Harvey's claims alleging that multiple provisions of the National Organic Program Final Rule ("Final Rule" or "Rule"), 7 C.F.R. Pt. 205, are inconsistent with the Organic Foods Production Act of 1990, 7 U.S.C. §§ 6501-6523 ("OFPA" or "Act").

Harvey appeals on seven of the nine counts he originally brought. For the reasons set forth below, we affirm the judgment on the first, second, fifth, sixth, and eighth counts and reverse on the third and seventh counts, and we remand for entry of judgment in accordance with this opinion.

## FACTUAL AND PROCEDURAL HISTORY

### I. OVERVIEW OF OFPA AND IMPLEMENTING REGULATIONS

Congress enacted OFPA in 1990 to "establish national standards governing the marketing" of organically produced agricultural products, to "assure consumers that organically produced products meet a consistent standard," and to "facilitate interstate commerce in" organically produced food. 7 U.S.C. § 6501. The Act furthers these purposes by establishing a national certification program for producers and handlers of organic products and by regulating the labeling of organic products. <u>Id.</u> §§ 6503(a), 6504, 6505(a)(1)(A). In order to be labeled or sold as organic, an agricultural product must be produced and handled

-3-

without the use of synthetic substances, such as pesticides, and in accordance with an organic plan agreed to by an accredited certifying agent and the producer and handler of the product. Id. § 6504; see also id. § 6505 (listing OFPA requirements for certification). Products meeting these standards may be labeled as such and may bear the USDA seal. Id. § 6505(a)(2).

Exceptions to the Act's general prohibition on synthetic substances appear on a National List of approved substances for organic products. 7 U.S.C. § 6517. OFPA requires the Secretary to establish a National Organic Standards Board to develop the National List and to recommend exemptions for otherwise prohibited substances. Id. §§ 6518(a), (k); 6517(c)(1). The Act contains detailed guidelines for the inclusion of substances on the National List. Id. § 6517(c).

The Act also requires the Secretary to promulgate regulations "to carry out" OFPA. Id. § 6521. The Secretary published the Final Rule at issue in this case in December 2000 and it became effective on October 21, 2002. See generally 7 C.F.R. Pt. 205. Among other things, the Rule sets forth a four-tier labeling system for organic foods. Id. § 205.301. Under this system, the type of labeling permitted on a product varies according to the percentage of organic ingredients it contains. Id. The Rule also includes loopholes concerning nonorganic ingredients and synthetic substances, id. §§ 205.600(b),

-4-

205.605(b), 205.606; exemptions for wholesalers and distributors, id. § 205.101(b)(1), as well as livestock herds converting to organic dairy production, id. § 205.236(a)(2)(i); and restrictions on the activities of private certifiers, id. §§ 205.303(a)(5), 205.303(b), 205.304(a)(3), 205.304(b)(2), 205.305(b)(2), 205.501(a)(11), 205.501(b). These are the provisions at issue in the present action and are outlined in more detail below.

## II. HISTORY OF THE PRESENT ACTION

Plaintiff-appellant Harvey is a producer and handler of organic blueberries and other crops, an organic inspector employed by USDA-accredited certifiers, and a consumer of organic foods. In October 2003 Harvey filed a complaint for declaratory and injunctive relief under the Administrative Procedure Act, 5 U.S.C. §§ 555(b), 702, 706(1), and under OFPA, alleging that nine provisions of the Final Rule are inconsistent with the Act and dilute its organic standards.

On cross-motions for summary judgment, Magistrate Judge Margaret J. Kravchuk issued a recommended decision finding that Harvey lacked standing to bring his seventh claim, granting Harvey summary judgment on his ninth claim, and granting the Secretary summary judgment on the remaining claims. Harvey v. Veneman, No. 02-216-P-H (D. Me. Oct. 10, 2003). The District Court adopted the magistrate judge's recommended decision with respect to Harvey's first eight claims, but granted summary judgment to the

-5-

Secretary, rather than Harvey, on his ninth claim. <u>Harvey</u> v. <u>Veneman</u>, 297 F. Supp. 2d 334, 335 (D. Me. 2004).  Harvey timely appealed the District Court's judgment on the following seven of his nine original claims:

Count 1: Harvey contends that the Rule provides for the blanket exemption of nonorganic products "not commercially available in organic form" from the review and recommendation process OFPA requires for inclusion of substances on the National List, in contravention of the purposes of OFPA and the National List.

Count 2: Harvey contends that the Rule's provisions allowing use of a private certifier's seal on products containing less than 95% organic ingredients, even though such products may not, according to OFPA, bear a USDA organic seal, are contrary to the purposes of OFPA.

Count 3: Harvey contends that the Rule's provisions permitting the use of synthetic substances in processing contravene OFPA, which prohibits the use of synthetic substances generally and specifically forbids the addition of synthetic ingredients in processing.

Count 5: Harvey contends that the Rule's exclusion of certain wholesalers and distributors from its coverage contravenes OFPA, which includes such entities among the "handlers" and "handling operations" to which it applies.

Count 6: Harvey contends that the Rule's prohibition on certifying agents' provision of uncompensated advice regarding certification standards contravenes OFPA, which prohibits only advice for compensation, and also violates the rights of such agents and their clients under the First Amendment to the United States Constitution.

Count 7: Harvey contends that the Rule's provisions allowing dairy animals being "converted" to organic production to be fed 80% organic feed for the first nine months of the year prior to sale of their products as organic contravenes OFPA, which requires dairy animals to be fed 100% organic feed for twelve full months prior to the sale of their products as organic.

Count 8: Harvey contends that the Rule's imposition of

uniform standards on private certifiers contravenes the purposes of OFPA.

**DISCUSSION**

## I.  STANDARD OF REVIEW

We review a district court's grant of summary judgment de novo.  People to End Homelessness, Inc. v. Develco Singles Apts. Assocs., 339 F.3d 1, 8 (1st Cir. 2003).  In doing so, we draw all reasonable inferences from the facts in favor of the appellant. Id.

We also review de novo challenges to agency action under the APA (that is, we do not defer to a district court's conclusions).  Associated Fisheries v. Daley, 127 F.3d 104, 109 (1st Cir. 1997).  Legal issues presented in such challenges are "'for the courts to resolve, although even in considering such issues the courts are to give some deference to the agency's informed judgment' in applying statutory terms if the statute is silent or ambiguous on the issue."  Penobscot Air Servs., Ltd. v. FAA, 164 F.3d 713, 719 (1st Cir. 1999) (quoting FTC v. Indiana Fed'n of Dentists, 476 U.S. 447, 454 (1986)).  "That deference is described in the familiar two-step test" of Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-44 (1984), according to which we first use traditional tools of statutory construction to determine congressional intent. Penobscot Air Servs., 164 F.3d at 719.  "[I]f the legislative intent is clear, we do not defer to the agency" and simply require

that the regulations be consistent with the statute.  Id.  If, on the other hand, "the statute is silent or ambiguous with respect to the specific issue," the question "is whether the agency's answer is based on a permissible construction of the statute."  Id. (citation and internal quotation marks omitted).  We accord deference to the agency "as long as its interpretation is rational and consistent with the statute."  Id. (citation omitted).

## II.  HARVEY'S STANDING

A plaintiff bringing legal claims in federal court must "establish standing to prosecute the action."  Elk Grove Unified Sch. Dist. v. Newdow, __ U.S. __, 124 S. Ct. 2301, 2309 (2004). This is partly a constitutional requirement; to meet the requirements of Article III, a plaintiff must point to an "injury in fact" that a favorable judgment will redress.  See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992).  It is also a prudential requirement.  To establish prudential standing, Harvey must show that his complaint "fall[s] within the zone of interests protected by the law invoked."  Newdow, 124 S. Ct. at 2309 (citation and internal quotation marks omitted).

Harvey alleges that he has suffered an injury in fact because the challenged regulations weaken the integrity of the organic program and the standards it sets forth.  This weakening harms Harvey as a consumer of organic foods because it degrades the quality of organically labeled foods.  The magistrate judge

-8-

properly held that this claimed harm represents concrete, redressable injury sufficient to confer Article III standing with respect to most of the counts in Harvey's complaint. It is well established that consumers injured by impermissible regulations satisfy Article III's standing requirements. See GMC v. Tracy, 519 U.S. 278, 286 (1997) ("Consumers who suffer [higher costs] from regulation forbidden under the Commerce Clause satisfy the standing requirements of Article III."); Baur v. Veneman, 352 F.3d 625, 628, 641-42 (2d Cir. 2003) (finding cognizable injury in fact where consumer alleged that USDA regulations permitting use of downed livestock for human consumption caused him increased risk of contracting food-borne illness); Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin., 793 F.2d 1322, 1324 (D.C. Cir. 1986) (finding that consumers suffered sufficient injury in fact to challenge regulations reducing fuel economy standards "because the vehicles available for purchase will likely be less fuel efficient than if the fuel economy standards were more demanding").

The magistrate judge concluded that Harvey lacked Article III standing with respect to his seventh count because Harvey failed to allege specifically that he was a consumer of organic milk or inspector of organic dairy operations. Recommended Decision on Cross-Motion for Summary Judgment, Civ. No. 02-216-P-H (Oct. 10, 2003), at 33. But Harvey has continuously alleged, as the magistrate judge acknowledged, that he purchases and consumes

organic products. Moreover, the record clearly contains Harvey's specific allegations that he has regular commercial dealings with organic dairy farmers and has purchased products containing dairy ingredients identified as organic. The magistrate judge erred in requiring more. Harvey has established that this particular regulation threatens sufficient injury to him as a consumer.

Harvey also clearly satisfies the requirements of prudential standing. The zone of interests test excludes only those whose interests are "so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." Clarke v. Sec. Indus. Ass'n, 479 U.S. 388, 399 (1987). Congress enacted OFPA to establish national standards governing the marketing of organic products, to assure consumers that organic products meet these standards, and to facilitate interstate commerce in organic products. See 7 U.S.C. § 6501. Harvey alleges that the Final Rule creates loopholes in the statutory standards, undermines consumer confidence, and fails to protect producers of true organic products. Harvey's alleged injuries fall precisely within the zone of interests that the statutes at issue were meant to protect.

## III. THE MERITS

A.  First Count: Alleged Exemption for Nonorganic
     Products Not Commercially Available

Harvey alleges that 7 C.F.R. § 205.606 permits the introduction of a wide variety of nonorganic ingredients into

organic or made-with-organic products in contravention of OFPA's general prohibition of such ingredients. The portion of the Rule at issue provides:

> The following nonorganically produced agricultural products may be used as ingredients in or on processed products labeled as "organic" or "made with organic (specified ingredients or food group(s))" only in accordance with any restrictions specified in this section.
> <u>Any nonorganically produced agricultural product may be used in accordance with the restrictions specified in this section and when the product is not commercially available in organic form.</u>
> (a) Cornstarch (native)
> (b) Gums -- water extracted only (arabic, guar, locust bean, carob bean)
> (c) Kelp -- for use only as a thickener and dietary supplement
> (d) Lecithin -- unbleached
> (e) Pectin (high-methoxy)

7 C.F.R. § 205.606 (emphasis added). Harvey maintains that the emphasized portion of the Rule allows the introduction of any nonorganic ingredient into processed products whenever an individual certifier determines that the ingredient is not commercially available in organic form. Harvey correctly points out that §§ 6517 and 6518 of OFPA require all specific exemptions to the Act's ban on nonorganic substances to be placed on the National List following notice and comment and subject to periodic review. <u>See</u> 7 U.S.C. §§ 6517(a), (d), (e); 6518(k), (l), (m). Harvey argues that the challenged provision allows ad hoc decisions regarding the use of synthetic substances, in contravention of

-11-

these statutory procedural requirements.

In the District Court and before this court, the Secretary has taken the position that § 205.606 does not create a blanket exemption, as Harvey contends, but rather permits use only of the ingredients specifically listed in that section. In other words, the Secretary maintains that the list of five products in § 205.606 is a part of the National List and that the provision emphasized above and challenged by Harvey should be interpreted simply as a further limitation on the addition of new nonorganic ingredients to the National List.

We agree with the District Court that the interpretation advanced by the Secretary is a plausible interpretation of the language of § 205.606 that eliminates any conflict with OFPA's requirements. The District Court was correct to conclude that, under the Secretary's interpretation, § 205.606 is not in contravention of OFPA.

However, the District Court did not clarify that it is necessary to interpret the Rule in this manner in order to find this portion of the Rule valid. Under other interpretations, § 205.606 might exceed the Secretary's authority under OFPA. In particular, the interpretation suggested by Harvey, although it is at odds with OFPA's evident requirements, is not an implausible construction of the language of § 205.606 considered alone. Indeed, the Secretary herself appears to have espoused exactly this

interpretation in the past. <u>See</u> 65 Fed. Reg. 80,616 ("In the regulation, a nonsynthetic and nonorganic agricultural product . . . used as a processing aid does not have to appear on the National List. Such products are included in the provision in § 205.606 that nonorganically produced agricultural products may be used in accordance with any applicable restrictions when the substance is not commercially available in organic form.").

In light of this possibility, it is insufficient for this court simply to affirm the District Court's judgment that § 205.606 is, as it stands, consistent with OFPA. Instead, to clarify that this portion of the Rule may not be interpreted in a way that contravenes the National List requirements of OFPA, we remand to the District Court for entry of a declaratory judgment that § 205.606 does not establish a blanket exemption to the National List requirements for nonorganic agricultural products that are not commercially available.

B.   Second Count: Use of Private Certifiers' Seals
on Products Containing Less Than 95% Organic
Ingredients

Harvey also challenges a part of the Final Rule permitting use of private certification notices and private certifiers' seals on products containing between 70 and 94% organic ingredients. 7 C.F.R. §§ 205.304(a)(3), (b)(2). Harvey acknowledges that the Act allows such products to be labeled as containing "organic" ingredients but contends that OFPA implicitly

prohibits the certification of such ingredients or the use of non-USDA seals on these products.  In his view, such certification runs afoul of § 6505(a)(1)(B) of the Act, which forbids labeling that "implies, directly or indirectly, that [a] product is produced and handled using organic methods" when it was not produced or handled in such a way.  Id.  We conclude that the Act does not prohibit, either implicitly or explicitly, the certification of organic ingredients or the use of private certifiers' seals and that the challenged portion of the Rule was a permissible exercise of the Secretary's discretion in this area.

The provision to which Harvey objects is one aspect of a comprehensive labeling and certification scheme set forth in the Rule.  See 7 C.F.R. §§ 205.301-205.305.  This scheme provides for four different types of product labels and for two different types of certification, all depending on the percentage of organic ingredients in the labeled product.  The labeling scheme distinguishes (1) products containing 100% organic ingredients, which may be labeled "100 percent organic," see id. § 205.301(a); (2) products containing 94 to 100% organic ingredients, which may be labeled "organic," see id. § 205.301(b); (3) products containing 70 to 94% organic ingredients, which may be labeled "made with organic (specified ingredients or food group(s))," see id. § 205.301(c), and (4) products containing less than 70% percent organic ingredients, which may identify each such ingredient on the

label or ingredient statement with the word "organic," see id. §§ 205.301(d), 205.305(a)(1). Harvey does not contest these portions of the Rule, which are plainly consistent with the Act's requirements. See 7 U.S.C. §§ 6505(a)-(c), 6510 (forbidding labeling of products as organically produced unless produced in accordance with the Act and providing that no more than 5% nonorganic ingredients may be added to processed foods handled in accordance with the Act, but also permitting labeling of ingredients as organic in processed foods containing less than 94% organic ingredients).

Harvey's challenge is to a portion of the Rule's parallel certification scheme. This scheme allows (1) products in the first two labeling categories, containing 95% or more organic ingredients, to bear both a USDA seal and the seal of a private certifying agent, see 7 C.F.R. §§ 205.303(b)(4)-(5), 205.311(a); (2) products containing 70 to 94% organic ingredients to bear a notice of private certification and the seal of a private certifying agent, see id. 205.304(a)(3), (b)(2); and (3) products containing less than 70% organic ingredients to bear neither a USDA seal nor that of a private certifier, see id. § 205.305(b). Harvey specifically objects to the second of these categories. He maintains that "the Act's limited exemption for identifying organic ingredients does not authorize the certification of products which do not meet the requirements of the Act" and that allowing

-15-

certification of such products misleads consumers, in contravention of 7 U.S.C. § 6505(a)(1)(B).

We note again that Harvey does not challenge the third tier of the Rule's labeling scheme, which allows products containing 70 to 94% organic ingredients to be labeled "made with organic (specified ingredients or food group(s))." 7 C.F.R. § 205.301(c). Rather, Harvey's challenge is to the use of private certification notices and seals on such products. His argument that use of private certifiers' seals to designate the presence of organic ingredients in a product contravenes OFPA depends on two related premises: (1) that the Act allows for only one kind or level of certification, namely, USDA certification, which cannot be uncoupled from private certification, and (2) that the Act does not contemplate the certification of ingredients or the use of private, non-USDA seals to indicate their certification.

Neither premise is supported by the Act itself. First, the Act does expressly restrict use of the USDA seal, see 7 U.S.C. § 6505(a)(2), and contemplates an extensive role for private certifying agents in implementing the Act's requirements.[1]

---

[1]See, e.g., 7 U.S.C. §§ 6502(3)-(5) (defining "certifying agent," "certified organic farm," and "certified organic handling operation"), 6503(d) (providing for certification of farms or handling operations by agents), 6506(a)(4)-(6) (providing for periodic review of organic programs by certifying agents), 6513(a) (providing for submission of organic plans to certifying agents), 6514(a)-(c) (addressing accreditation of certifying agents), 6515(a)-(j) (setting forth "[r]equirements of certifying agents"), 6516(a)-(b) (addressing peer review of certifying agents),

However, it is silent on the use of private certifiers' seals and on the standards for inclusion of private certification information on product packaging. Since the Act does not address private certification at all, it necessarily cannot address whether private certification may be uncoupled from USDA certification.

Second, the Act does provide for the identification of ingredients as organic when a product contains less than 95% organic ingredients, id. § 6505(c)(1)-(2), but it is silent on whether such identification may or may not include certification of such ingredients as organic and/or a private certifier's mark. In other words, with respect to products containing less than 95% organic ingredients, the Act speaks only to the labeling portion of the tiered scheme described above. With respect to certification of products in this category, the Act is silent.

Since the Act is silent on these issues, we must conclude that Congress committed the questions to the Secretary's discretion and assess the challenged portions of the Rule for their reasonableness in light of OFPA's overall scheme. Penobscot Air Servs., 164 F.3d at 719; see also United States v. Haggar Apparel Co., 526 U.S. 380, 392 (1999) ("If . . . the agency's statutory interpretation fills a gap or defines a term in a way that is reasonable in light of the legislature's revealed design, we give

---

6518(b)(7) (setting aside seat on the National Organic Standards Board for a certifying agent), 6519(d)-(e) (addressing violations reported and committed by certifying agents).

that judgment controlling weight." (citations and internal quotation marks omitted)).

The challenged regulations are reasonable in light of OFPA's overall scheme. The Act clearly authorizes the use of the word "organic" on the packaging of products made with 70 to 94% organic ingredients. 7 U.S.C. § 6505(c)(1). Under the Act, certifying agents play a crucial role in determining whether an ingredient derives from an organic operation. Id. § 6503(d). Given these statutory directives, the Secretary's requirement that labels on third-tier products (containing 70 to 94% organic ingredients) identify the agent responsible for certifying such ingredients is not unreasonable. This information allows the Secretary to identify and track certifiers on a product-by-product basis, creates consumer confidence that the specified ingredients are indeed organic, and provides the name of the certifier, which may be useful to some consumers. Far from contravening the Act, the certification requirement furthers its purpose of assuring consistency. See id. § 6501 (stating purposes of OFPA).

Nor is it unreasonable for the Secretary to permit inclusion of private certifiers' seals on such products. Such seals will tend to increase consumer confidence and to facilitate interstate commerce in organic products, furthering two of OFPA's three goals. See id. Harvey and the amici argue that the presence of a non-USDA seal on some products will confuse consumers.

-18-

Consumers might be confused by the presence of <u>USDA</u> seals on products containing 70 to 94% organic ingredients. <u>See</u> <u>id.</u> §§ 6505(a)(1)(B), 6505(a)(2), 6510(a)(4). But it is difficult to see how a <u>non-USDA</u> seal applied in compliance with the challenged provisions could create similar confusion, particularly since the seal will be accompanied by labeling stating not that the product is "100% organic" or "organic" but merely that it is "made with organic (ingredients)." Under these circumstances, a private certifier's seal appearing alone on a label serves simply to reiterate the identification of the agent certifying the ingredient. Harvey points to no support, statutory or otherwise, for his contention that the identification of an ingredient as "organic" is somehow less confusing to consumers than identification of a private certifier or use of such a certifier's seal, yet such a distinction is crucial to his argument. Because we can see no basis for the distinction, we reject the inference.

We conclude that the District Court did not err in upholding the challenged portions of the Final Rule as permissible exercises of the Secretary's authority. We therefore affirm the District Court's judgment on this count of Harvey's complaint.

C. Third Count: Use of Synthetic Substances in Processing

Harvey next challenges two parts of the Rule permitting synthetic substances to be used in processed organic foods. 7 C.F.R. §§ 205.600(b), 205.605(b). Section 205.600(b) provides

-19-

that synthetic substances may be used "as a processing aid or adjuvant" if they meet six criteria; § 205.605(b) lists thirty-eight synthetic substances specifically allowed in or on processed products labeled as organic. These provisions, Harvey contends, contravene the plain language of OFPA, which provides that certified handling operations "shall not, with respect to any agricultural product covered by this title . . . add any synthetic ingredient during the processing or any postharvest handling of this product." 7 U.S.C. § 6510(a)(1). Harvey is correct; the challenged regulations lie outside of the scope of authority granted the Secretary by OFPA.

The Secretary conceded before the District Court that § 6510(a)(1) constitutes a "general prohibition" against adding synthetic ingredients in handling operations. The Secretary argues, however, that § 6517 of the Act, which directs the establishment of the National List and governs the creation of exemptions from the Act's general prohibitions, allows the listing of synthetics for use in the handling of products labeled organic. We reject this argument. Section 6517 plainly forbids the use of synthetic substances in handling operations. This section provides that

> The National List may provide for the use of
> substances in an organic farming or handling
> operation that are otherwise prohibited under
> this title <u>only if</u> . . .
> (B)  the substance--
>     (i)  is used in <u>production</u> and contains

-20-

>> an active _synthetic_ ingredient in the following categories . . .
>> (ii) is used in _production_ and contains _synthetic_ inert ingredients that are not classified by the Administrator of the Environmental Protection Agency as inerts of toxicological concern; or
>> (iii) is used in _handling_ and i[s] _non-synthetic_ but is not organically produced. . . .

7 U.S.C. § 6517 (emphases added). This section contemplates use of certain synthetic substances during the production, or growing, of organic products, but not during the handling or processing stages.[2] The challenged regulations, which permit the use of certain synthetic substances "as processing aids," thus contravene the plain language of this section of the Act as well.

The Secretary notes that some subsections of § 6517 refer to "farming or handling" activities together, and the Secretary claims that this language renders the Act ambiguous or inconsistent, permitting the Secretary to draft a reasonable reconciliation. We reject this characterization of the Act. Section 6517(c) clearly establishes a three-prong test for exemption of otherwise prohibited substances and their inclusion on the National List. Prong (A), not quoted above, sets forth requirements that any otherwise prohibited substance, whether used

---

[2] _See_ 7 U.S.C. § 6502(8) (defining "handle" as "to sell, process, or package agricultural products"), (18) (defining "producer" as "a person who engages in the business of growing or producing food or feed").

-21-

in production or handling, must meet to be exempted.[3]  Prong (B), quoted above, specifically requires that substances used in handling be nonsynthetic.  Prong (B) is not inconsistent with prong (A); it merely sets forth more specific requirements with regard to the types of substances that may be used in production and handling, respectively.  The Act is neither ambiguous nor inconsistent; § 6510 bars addition of "any synthetic ingredient during the processing or any postharvest handling of the product," and § 6517 furthers that prohibition.

The challenged regulations are contrary to the plain language of OFPA and therefore exceed the Secretary's statutory authority.  See Chevron, 467 U.S. at 842-43 ("If the intent of Congress is clear, that is the end of the matter. . . .").  We therefore reverse the District Court's grant of summary judgment to the Secretary on this count.[4]

---

[3]This subsection requires such substances to be "not . . . harmful to human health or the environment"; necessary to production or handling of an agricultural product "because of the unavailability of wholly natural substitute products"; and "consistent with organic farming and handling."  7 U.S.C. § 6517(c)(1)(A)(i)-(iii).

[4]We note that in his brief, Harvey admits that he has withdrawn his challenge as to some of the thirty-eight substances listed in 7 C.F.R. § 205.605(b) because use of the substances is required by other statutes.  Our reversal of the District Court's judgment is without prejudice to any such concessions made by Harvey or to the general principle of 20 U.S.C. § 6519(f), which provides that OFPA is not to be interpreted to alter the Secretary's authority under other statutes.

D.   Fifth Count: Exemption of Wholesalers and Distributors from Certification Requirements

Harvey next challenges 7 C.F.R. § 205.101(b)(1), a portion of the Final Rule that excludes from the Act's coverage and requirements "handling operations" selling products that are "packaged or otherwise enclosed in a container prior to being received or acquired by the operation" and that "[r]emain in the same package or container and are not otherwise processed while in the control of the handling operation."  Id. § 205.101(b)(1)(i)-(ii).  According to Harvey, this provision impermissibly excludes wholesalers and distributors, a subset of those engaged in "handling operations," from certification and other OFPA requirements.  But, Harvey argues, OFPA expressly exempts from its certification requirements only one subset of those engaged in "handling operations," namely, retailers who do not process the foods they sell.  7 U.S.C. §§ 6502(9), (10).  According to Harvey, the Act cannot be read to permit the additional blanket exemption of wholesalers and distributors.

OFPA's exclusion of final retailers from its coverage shows that Congress knew how to exclude operations otherwise subject to the Act and must be presumed to have acted deliberately when it did not specifically exclude those that handle only packaged products.  See id.  That, however, is not the end of the story.  Section 6510 of the Act specifies the requirements for certification of handling operations.  Id. § 6510.  Each of the

-23-

seven subsections of § 6510 prohibits either the addition of contaminants or exposure to contaminating materials. Id. § 6510(a)(1)-(7). The evident purpose of this section is to ensure that operations handling organic products will not contaminate or expose to contamination those products. But operations handling only packaged products (as defined in the regulation) do not present the contamination hazards at which this section——and hence the certification process——is aimed. Thus, certification is irrelevant to those operations that handle only packaged products.

The statutory definition of handling operations in § 6502(10), on its face, appears to include operations handling only sealed packaged products. But the requirements for certification of handling operations in § 6510 appear to have no application to operations handling only sealed packaged products, which by their nature could not engage in any of the proscribed activities. This portion of the statute therefore lacks coherence and consistency, creating ambiguity concerning Congress' intent. See, e.g., Barnhart v. Signmon Coal Co., Inc., 534 U.S. 438, 450 (2002) (holding that inquiry as to statutory ambiguity ceases "if the statutory language is unambiguous and the statutory scheme is coherent and consistent") (internal quotation marks and citation omitted); Salinas v. United States, 522 U.S. 52, 60 (1997) (noting that in order for a statute to be considered unambiguous, "[i]t need only be plain to anyone reading the Act that the statute

-24-

encompasses the conduct at issue") (internal quotation marks and citations omitted); Brown v. Gardner, 513 U.S. 115, 118 (1994) ("Ambiguity is a creature not of definitional possibilities but of statutory context.") (citation omitted). Because "the statute is silent or ambiguous with respect to the specific issue," the court must defer to the Secretary's reasonable interpretation of the statute. Chevron, 467 U.S. at 843-44. We therefore affirm the District Court's grant of summary judgment to the Secretary on this count.

E.    Sixth Count: Prohibition on Uncompensated
      Advice from Private Certifiers

Harvey also challenges 7 C.F.R. § 205.501(a)(11)(IV), which prohibits certifying agents from "giving advice or providing consultancy services, to certification applicants or certified operations, for overcoming identified barriers to certification." Harvey contends, first, that this regulation clearly conflicts with 7 U.S.C. § 6515(h), which bars certifying agents only from mixing advice with financial interest:

> Any certifying agent shall not--
> (1)  carry out any inspections of any operation in which such certifying agent . . . has, or has had, a commercial interest, including the provision of consultancy services;
> (2)  accept payment, gifts, or favors of any kind from the business inspected other than prescribed fees; or
> (3)  provide advice concerning organic practices or techniques for a fee, other than fees established under such program.

Id.  Harvey argues further that even if the relevant portion of

-25-

OFPA is ambiguous, deference to the Secretary's interpretation as embodied in the portion of the Rule at issue is not warranted, because this regulation raises serious constitutional questions in that it conditions receipt of a public benefit——USDA accreditation——on the relinquishment of free speech rights. See Legal Servs. Corp. v. Velazquez, 531 U.S. 533, 544 (2001).

In connection with the first of these arguments, Harvey specifically contends that § 6515(h), titled "Conflicts of interest," constitutes the complete list of certifier activities banned by Congress and may not be interpreted to bar activities not involving financial benefit to the advice giver. But as the Secretary points out, the statute is not quite so narrowly focused; it also bars inspections when the certifier "has had" a commercial interest in an operation and prohibits inspectors from accepting "favors of any kind." 7 U.S.C. § 6515(h)(1), (2). As its title suggests, the subsection regulates conflicts of interest and certifier integrity generally. It neither addresses nor excludes the question of whether the provision of free advice may risk a conflict of interest.

Since the statute is ambiguous on this point, we reach step two of Chevron and must defer to the Secretary's interpretation if it is reasonable. Chevron, 467 U.S. at 843. We conclude that this interpretation is reasonable. It is easy to imagine situations in which providing free advice might create a

conflict of interest for a certifier; the Secretary outlines a scenario in which a certifier provides well-meaning but erroneous advice on compliance with the Act to a producer, then later is faced with a choice between reporting the producer's violation and recanting the erroneous advice, a step that could injure the certifier's own reputation and credibility. Section 6515(h) is concerned with ensuring certifiers' integrity and avoiding conflicts of interest. It does not preclude the Secretary from imposing additional requirements tending to achieve these ends. The challenged regulation is therefore neither inconsistent with the Act nor an unreasonable interpretation of the Secretary's authority.

Harvey argues that if we find the statute ambiguous on this point, any Chevron deference due the Secretary's interpretation is offset by the requirement that we construe statutes, where possible, to avoid conflict with the Constitution. See Rust v. Sullivan, 500 U.S. 173, 190-91 (1991); see also U.S. West, Inc. v. FCC, 182 F.3d 1224, 1231 (10th Cir. 1999) ("[D]eference to an agency interpretation is inappropriate not only when it is conclusively unconstitutional, but also when it raises serious constitutional questions."). According to Harvey, the challenged regulation raises a substantial constitutional question, since it conditions receipt of a government benefit on speech restrictions.

In making this argument, Harvey relies primarily on <u>Legal Services Corp.</u> v. <u>Velazquez</u>, 531 U.S. 533 (2001).[5] In <u>Legal Services Corp.</u>, the Supreme Court invalidated restrictions on the speech of attorneys representing welfare claimants in a government-funded legal services program. The Court noted that the challenged program "was designed to facilitate private speech, not to promote a governmental message," and contrasted it in this regard with the program in <u>Rust</u> v. <u>Sullivan</u>, 500 U.S. 173, in which the government "used private speakers to transmit information pertaining to its own program," a program of federal funding for family planning clinics. <u>Legal Servs. Corp.</u>, 531 U.S. at 541-42 (citation and quotation omitted). The Court in <u>Legal Services Corp.</u> emphasized that "when the government disburses public funds to private entities to convey a governmental message[, as in <u>Rust</u>], it may take legitimate and appropriate steps to ensure that its message is neither garbled nor distorted by the grantee." <u>Id.</u> at 541 (quoting <u>Rosenberger</u> v. <u>Rector & Visitors of Univ. of Va.</u>, 515 U.S. 819, 833 (1995)).

The present case is clearly more nearly analogous to

[5]The Secretary argues that the constitutionality of the regulation should instead be analyzed under <u>Pickering</u> v. <u>Board of Education</u>, 391 U.S. 563 (1968), because certifiers are government employees. <u>Pickering</u> is not appropriate to analysis of this regulation, since certifiers are not by definition government employees or recipients of government funds. <u>See</u> 7 U.S.C. § 6514 (setting forth requirements for accreditation as applicable to both State officials and "private person[s]").

<u>Rust</u>, in which the Court found that speech restrictions did not create a constitutional problem, than to <u>Legal Services Corp.</u>, in which the Court found that they did. In OFPA, the government has not created a program to facilitate private speech, as in <u>Legal Services Corp.</u> Instead it has created a scheme that uses private certifiers to transmit information regarding the national certification program, a clear example of a "governmental message." <u>Legal Servs. Corp.</u>, 531 U.S. at 541; <u>see</u> <u>also</u> <u>Rosenberger</u>, 515 U.S. at 833 ("we have permitted the government to regulate the content of what is or is not expressed when it is the speaker or when it enlists private entities to convey its own message").

The limitation at issue, as discussed above, is a reasonable addition to OFPA's provisions for minimizing certifier conflicts of interest. We conclude that it is also an appropriate restriction on speech within OFPA's scheme and raises no serious constitutional difficulties. We therefore affirm the District Court's grant of summary judgment to the Secretary on this count.

F.  Seventh Count: Conversion of Dairy Herds to
Organic Production

Harvey also challenges a portion of the Rule creating an exception to the Act's requirements for dairy herds being converted to organic production. 7 C.F.R. § 205.236(a)(2)(i). OFPA provides that "[a] dairy animal from which milk or milk products will be sold or labeled as organically produced shall be raised and handled in accordance with this title for not less than the 12-month period

immediately prior to the sale of such milk and milk products."

7 U.S.C. § 6509(e)(2). The challenged rule, in contrast, provides

that

> when an entire, distinct herd is converted to organic production, the producer may:
>     (i)For the first 9 months of the year, provide a minimum of 80-percent feed that is either organic or raised from land included in the organic system plan and managed in compliance with organic crop requirements; and
>     (ii)Provide feed in compliance with § 205.237 for the final 3 months.

7 C.F.R. § 205.236(a). Section 205.237, referred to in the quoted

portion of the Rule, provides that "[t]he producer of an organic

livestock operation must provide livestock with a total feed ration

composed of agricultural products, including pasture and forage,

that are organically produced and, if applicable, organically

handled." Id. § 205.237 (emphasis added). The reference to a

"total feed ration" of organically produced feed products indicates

that livestock must ordinarily be fed 100% organic feed to qualify

as part of an "organic livestock operation."[6] Id. Under the

challenged regulation, a converting dairy herd must be fed this way

for only three months. In contrast, under § 6509(e)(2) of OFPA,

dairy animals must be "handled organically" for a full twelve

---

[6]This interpretation of "total feed ration" is consistent with the legislative history of OFPA. See S. Rep. No. 101-357, 1990 U.S.C.C.A.N. 4656, 5222 ("Livestock must be fed 100 percent organically grown feed. . . . [Dairy] livestock [must] be raised according to all of the above standards for . . . not less than one year.").

-30-

months before their products may be labeled organic. In other words, OFPA clearly requires a single type of organic handling for twelve months before sale of dairy products as organic, 7 U.S.C. § 6509(e)(2), whereas the Final Rule requires two different levels of organic feed during that twelve-month period, 7 C.F.R. § 205.236(a). The statutory and regulatory directives directly conflict on this point.

The Secretary admits that OFPA requires dairy livestock to be fed organically produced feed for the twelve months before their milk is sold as organic. See 7 U.S.C. § 6509(e)(2). The Secretary characterizes the challenged regulation, which provides for a phased conversion process, as an "exception" to this requirement. The Secretary justifies this exception through a twofold argument for the validity of § 205.236(a): (1) OFPA is silent on the question of dairy herd conversion, so the Secretary has freedom to promulgate reasonable regulations on this subject; and (2) even if § 6509(e)(2) of the Act is construed to govern the conversion of dairy herds, the Act does not specify the meaning of the term "handled organically," so the Secretary may fill this gap with a reasonable interpretation, such as that contained in § 205.236(a) of the Rule. We reject both arguments.

First, the twelve-month requirement of § 6509(e)(2) has little meaning if it does not govern situations in which a dairy animal is being "converted" to organic production, and nothing in

the Act indicates that the standards for organic production are different for entire herds than for single animals. Reasonably construed, OFPA sets forth clear requirements for dairy herd conversion in § 6509(e)(2), and the Secretary may not promulgate a regulation directly at odds with those statutory requirements.

Second, while the Act itself does not define "handled organically," the Secretary appears to have filled that gap with respect to the feed provided dairy animals in § 205.237(a), which, fairly construed, requires 100% organic feed. This interpretation is consistent with Congress' intent as expressed in the legislative history of OFPA. See S. Rep. No. 101-357, 1990 U.S.C.C.A.N. 4656, 5222. Even if the meaning of "handled organically" remained unclear, it would be impossible to reconcile the phased conversion process set forth in the challenged rule with the one-step process that § 6509(e) of the Act sets forth. Nothing in the Act's plain language permits creation of an "exception" permitting a more lenient phased conversion process for entire dairy herds.

The Secretary's creation of such an exception in the challenged provision of the Rule is contrary to the plain language of the Act. See Chevron, 467 U.S. at 842-43. The District Court was in error in concluding otherwise, and we therefore reverse its judgment on this count of Harvey's complaint.

    G.    Eighth Count: Prohibition on Distinct Private Certification Standards

Harvey's final challenge is to a provision of the Final

Rule that prohibits a certifying agent from

> requir[ing] compliance with any . . .
> practices other than those provided for in the
> Act and the regulations . . . as a condition
> of use of [the agent's] identifying mark:
> Provided, That, certifying agents certifying
> production or handling operations within a
> State with more restrictive requirements,
> approved by the Secretary, shall require
> compliance with such requirements as a
> condition of use of their identifying
> mark. . . .

7 C.F.R. § 205.501(b)(2). Harvey argues not that this regulation contravenes any specific provision of the Act, but that its limitation on more stringent private standards is counter to the purposes of OFPA. Specifically, Harvey maintains that the limitation will suppress competition among users of organic production and handling methods, create consumer confusion, and limit consumer choice. Harvey also argues for the first time on appeal that the regulation impermissibly regulates commercial speech and is therefore unconstitutional.

In fact, the challenged regulation does not frustrate the purposes of the Act; it furthers them. Congress clearly set forth OFPA's purposes in the Act itself. The aim of the system established by the Act is, in part, to help "establish national standards governing the marketing" of organic products and to "assure consumers that organically produced products meet a consistent standard." 7 U.S.C. § 6501. The Act accordingly calls for the establishment of a national organic production program and

national standards for organic production, id. §§ 6503, 6504, and provides that products may be labeled "organically produced only if such product is produced and handled in accordance with this title," id. § 6505(a)(1)(A). OFPA further provides that State certification programs may be more restrictive than the federal program. Id. § 6507(b)(1). This provision, incidentally, allows for the type of competition developing more stringent organic standards sought by Harvey.

The Act is silent, however, on the issue of more stringent private standards or certification requirements, just as it is silent on the use of private certifiers' seals. Since this is a matter on which Congress did not speak, Chevron requires us to assess whether the challenged regulation is a reasonable interpretation of the Act. Chevron, 467 U.S. at 843. We conclude that it is. As noted above, the Act's provision for more stringent State standards allows for the kind of competitive advancement of standards Harvey desires. Additionally, as the Secretary points out, nothing in the challenged regulation prevents private certifiers from making truthful claims about the products they certify; it only bars such certifiers from applying more stringent requirements as a condition of use of their USDA-accredited certifying mark. This ban is a reasonable means of furthering the Act's concern with consistency.

We decline to consider Harvey's constitutional argument.

Harvey concedes that he did not raise the issue before the District Court but argues that our consideration of it is warranted under National Ass'n of Social Workers v. Harwood, 69 F.3d 622, 627-29 (1st Cir. 1995). In Harwood, we noted that we countenance consideration of arguments not raised below when six factors "heavily preponderate in favor of" considering them. Id. at 628. It may be appropriate to consider an omitted argument when it (1) is "purely legal in nature and lends itself to satisfactory resolution on the existing record without further development of the facts," (2) "raises an issue of constitutional magnitude," (3) "is highly persuasive" or threatens a "miscarriage of justice" if not addressed, (4) does not threaten prejudice or inequity to the adverse party if addressed, (5) was omitted inadvertently, and (6) "implicates matters of great public moment." Id. The issue here is purely legal and constitutional, satisfying the first and second Harwood factors, and it may have been omitted inadvertently, satisfying the fourth, but Harvey does not argue convincingly that failing to reach the claim will threaten a miscarriage of justice or that the issue is one of great public moment. See id. (noting that the "great public moment" factor is "perhaps most salient"). On balance, the factors do not preponderate heavily in favor of considering the question.

The provision at issue is a reasonable interpretation of a matter on which the Act is silent, so it was a valid exercise of

the authority delegated to the Secretary by the Act. We therefore affirm the District Court's grant of summary judgment to the Secretary on this count.

## CONCLUSION

We **REMAND** the first count of Harvey's complaint to the District Court for entry of declaratory judgment clarifying the permissible interpretation of the regulation at issue in accordance with this opinion.

On the second, fifth, sixth, and eighth of Harvey's counts, we **AFFIRM** the District Court's grant of summary judgment to the Secretary.

On the third and seventh of Harvey's counts, we **REVERSE** the District Court's grant of summary judgment to the Secretary and **REMAND** the counts to the District Court for entry of summary judgment in Harvey's favor.

The parties shall each bear their own costs.